UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

# M-10-1406

- - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -

AHMED JAARA,
    also known as "Ahmed Knight,"

              Defendant.

- - - - - - - - - - - - - - - - -X

COMPLAINT AND AFFIDAVIT IN
SUPPORT OF ARREST WARRANT

(T. 18, U.S.C., § 1951(a))

EASTERN DISTRICT OF NEW YORK, SS:

        Philip Wu, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation ("FBI"), duly appointed according to law and acting as such.

        Upon information and belief, on or about and between August 16, 2010 and August 28, 2010, within the Eastern District of New York and elsewhere, the defendant AHMED JAARA, also known as "Ahmed Knight," together with others, did knowingly and intentionally conspire to obstruct, delay and affect commerce and the movement of articles and commodities in commerce, by extortion, to wit: the extortion of the owner of a bus company.

        (Title 18, United States Code, Sections 1951(a) and 2)

        The source of your deponent's information and the grounds for his belief are as follows:[1]

        1.   I have been a Special Agent assigned to the FBI squad that investigates Asian organized crime since April 2009. During my tenure with the FBI, I have participated in numerous

---

    [1]   Because the purpose of this Complaint is to state only probable cause to arrest, I have not described all the relevant facts and circumstances of which I am aware.

organized crime investigations over the course of which I have conducted physical surveillance, executed search warrants, supervised the activities of cooperating witnesses, and reviewed recorded conversations of organized crime figures.  Through my training, education and experience, I have become familiar with organized criminal activities.

2.    As set forth below, there is probable cause to believe that the defendant AHMED JAARA, also known as "Ahmed Knight," together with others, conspired to extort the owner of a bus company (the "VICTIM BUS COMPANY").

3.    The VICTIM BUS COMPANY currently provides bus transport between Worcester, Massachusetts, and Brooklyn and Queens, New York.

4.    John Doe #1, who is an employee of the VICTIM BUS COMPANY, has advised:

a.    On or about August 16, 2010, a group of males approached John Doe #1 in the vicinity of a parking lot located at 60 Madison Street, Worcester, Massachusetts (hereinafter, the "Parking Lot").  One of those males, who as described in Paragraph 16 was later identified by John Doe #1 as the defendant AHMED JAARA, also known as "Ahmed Knight," then handed John Doe #1 a cellular telephone.

b.    On the other end of the cellular telephone was a male (hereinafter, "UM#1"), who told John Doe #1, in sum and substance and in part, to tell the owner of the VICTIM BUS COMPANY to either pay $50,000 or to stop providing bus service.

c.   Another male then rolled up one of John Doe #1's shirt sleeves, wrote the telephone number (508) 246-8028 on the arm of John Doe #1, and directed John Doe #1 to have the owner of the VICTIM BUS COMPANY call (508) 246-8028.

5.   A review of a video recording taken of the vicinity of the Parking Lot on or about August 16, 2010, reveals the following:

a.   Shortly after two vehicles, one of which appeared to be a light-colored Hyundai Elantra, entered the Parking Lot, a group of males approached John Doe #1.

b.   One of the males then handed John Doe #1 a cellular telephone.  Another male later rolled up the shirt sleeve worn by John Doe #1 and appeared to write something on the arm of John Doe #1.

6.   On or about August 25, 2010, John Doe #2, the owner of the VICTIM BUS COMPANY, who was equipped with a recording device, placed a telephone call to (508) 246-8028.  A male who answered the telephone call (hereinafter, "UM#2")[2] told John Doe #2, in sum and substance and in part, to pay $50,000. UM#2 further warned John Doe #2, in sum and substance and in part,  that if he did not comply, the VICTIM BUS COMPANY's buses would be damaged and/or the lives of the drivers employed by the VICTIM BUS COMPANY would be in jeopardy.

---

[2]   Because John Doe #2 was not a party to the telephone call between John Doe #1 and UM#1, it is not clear whether UM#1 is the same individual as UM#2.

7.     Later in the evening, on or about August 25, 2010, another male (hereinafter, "UM#3")[3/] placed a telephone call to John Doe #2, who was equipped with a recording device.  UM#3 repeated the previous threat by UM#2 that if John Doe #2 did not pay $50,000, the lives of the drivers employed by the VICTIM BUS COMPANY would be in jeopardy.

8.     On or about August 26, 2010, at the direction of the FBI, John Doe #2 engaged in several phone conversations with one or more males who called from or answered telephone number (508) 246-8028, during which conversations they discussed how the above-referenced payment would be made.  During one of those conversations, a male using telephone number (508) 246-8028 proposed that John Doe #2 send a payment by Western Union to "Diamond Weah."  John Doe #2 ultimately agreed, in sum and substance and in part, that he would bring $10,000 to the Parking Lot at approximately 4:15 p.m. on August 27, 2010 and that he would make four subsequent payments of $10,000 in accordance with the demand.

9.     On August 27, 2010, at approximately 4:15 p.m., agents of the FBI equipped John Doe #2 with a recording device and directed him to wait in the Parking Lot.  John Doe #2 brought $10,000 packaged in a blue gift bag.  The agents then conducted surveillance in the vicinity of the Parking Lot and made the following observations.

---

[3/]     Because John Doe #2 was not a party to the telephone call between John Doe #1 and UM#1, it is not clear whether UM#1 is the same individual as UM#3.

5

a.    A red vehicle (hereinafter, "Vehicle #1") drove into a gas station located in close proximity to the Parking Lot and shortly thereafter drove into the Parking Lot.

b.    The driver of Vehicle #1, an Asian male, then exited Vehicle #1 and entered the back seat of a white SUV (hereinafter, "Vehicle #2"), which was already parked in the Parking Lot.

c.    The driver of Vehicle #2 pulled the driver's side of Vehicle #2 alongside the driver's side of a vehicle driven by John Doe #2, which was parked in the Parking Lot.

d.    Shortly thereafter, Vehicle #2 exited the Parking Lot.

10.    Shortly after Vehicle #2 exited the Parking Lot, agents of the FBI conducted a car stop of Vehicle #2.  In the front driver's seat was Hung Danh; in the front passenger's seat was Diamond Weah; in the rear seat directly behind the driver's seat was Jian Hao Liu.  FBI agents recovered a blue gift bag containing $10,000 underneath the rear seat directly behind the driver's seat.  Danh, Weah and Liu were then placed under arrest.

11.    John Doe #2 has advised the following in regard to what transpired in the Parking Lot on August 27, 2010.

a.    Vehicle #2 pulled up alongside the vehicle in which John Doe #2 was driving.

b.    The driver of Vehicle #2, who was subsequently identified as Hung Danh, asked, in sum and substance and in part, for "the money."

c.   John Doe #2 then gave the $10,000, which was packaged in the blue gift bag, to the individual in the driver's side passenger seat of Vehicle #2, who was subsequently identified as Jian Hao Liu.  Liu then asked John Doe #2, in sum and substance and in part, when he would provide the remaining money.

12.  Following Danh's arrest, Danh was advised of his Miranda rights, which rights he indicated he understood and agreed to waive.  On the morning after Danh's arrest, Danh agreed to place a recorded telephone call to an individual Danh identified as "Ahmed Knight," who, as described in Paragraphs 15 and 16 was subsequently identified as the defendant AHMED JAARA, also known as "Ahmed Knight," at telephone number (508) 797-5176. During the consensually-recorded telephone call, the following discussion between Danh and the defendant AHMED JAARA occurred:[2]

> DANH:    You like remember how the time we
>          freaking went to those Asian dudes
>          with the buses and shit, and to
>          scare them niggas.
>
> JAARA:   Yeah.
>
> DANH:    You remember that shit?
>
> JAARA:   What?
>
> DANH:    You remember that shit though?
>
> JAARA:   Yeah.
>
> DANH:    Yo I been stressing that shit OD.
>          You, you don't understand like, you

---

[2]    The excerpts of recorded conversations included herein are based on draft transcripts of those conversations, which are subject to revision.

> feel me where I'm coming from.
> Like we don't know this dude, like
> it was in the middle of nowhere.
> Like anybody could see this, like
> anytime, anywhere.  You know what
> I'm trying to say.  Like we were so
> hot boxed that day.  Like man, like
> so noticeable, like we surround
> that dude.  Remember?

JAARA:    Yeah nigga.

DANH:     Remember like I took like, you give
          him the phone and like I wrote my
          number on his arm.

JAARA:    Shit, that shit's stupid.

At the conclusion of the telephone call, the defendant AHMED
JAARA told Danh that he would call him back from the defendant's
cellular telephone.

13.  A few minutes later, Danh, who was again equipped
with a recording device, received a telephone call from the
defendant AHMED JAARA, also known as "Ahmed Knight."  The
following discussion then occurred:

DANH:     Yo I can't sleep, just woke up.
          Mad tired.  Like been stressing
          about shit.

JAARA:    Why?  You wanna do that shit nigga?

DANH:     Hm yeah, but I'm just saying, what
          if people seen us do that shit.

JAARA:    Huh?

DAHN:     What if what if what if somebody
          seen us do that shit?  What if
          people asks us question about it,
          yo?  Asks you question about it?

JAARA:    [U/I] don't know nothing about that
          shit.

8

DANH:      What if people ask you about it
           nigga?

JAARA:     You say, nigga don't say nothing.

DANH:      Yeah.

                    * * *

DANH:      We just man.  Like you don't
           understand what we did.  We went up
           to a person we don't barely know.
           Harasses him, like threaten him by
           his life dog, know what I'm saying?
           Like, know what I mean, anything
           could happen nigga.  Know what I'm
           saying?

JAARA:     [Laugh] Oh shit, you wish nigga.

DANH:      You hand the phone to him too my
           dude.  Yo you hand the phone too,
           my nigga.

JAARA:     Huh?

DANH:      You hand the phone to him too,
           nigga.

JAARA:     Yeah I know.

                    * * *

JAARA:     If what Jin said was true.

DANH:      What did he say?  What did Jin say,
           what did Jin say though?

JAARA:     Nothing, he said how they make
           money and shit.  Nigga and how shit
           was illegal.  But that ain't my
           problem.  Whatever had to be done
           had to be done, you feel me?  Shit
           nigga, we shouldn't be talking
           about this over the phone nigga.

Based on my knowledge of this investigation, I believe the

defendant AHMED JAARA's reference to "Jin" was a reference to

Jian Hao Liu.  In addition, I believe the mention of JAARA's

handing "the phone to him" and Danh's admission to his writing "my number on his arm" are references to the approach of John Doe #1 in the Parking Lot on August 16, 2010.

14.  Shortly thereafter, Danh engaged in a third recorded telephone conversation with the defendant AHMED JAARA, during which the following conversation occurred:

> DANH:     Like this mad shit been going
>           through my mind.  Like gutter, like
>           this, this and that.  Know what I
>           mean.
>
> AHMED:    This shit been going through all of
>           our mind, nigga.  We trying to make
>           money.  You feel me?
>
> DANH:     Yeah son.  My fault for waking you
>           up man.  Huh?
>
> JAARA:    Like that's why me, like right now
>           nigga, me and [U/I] don't give a
>           fuck what we do nigga, as long as
>           we got money in our pocket, you
>           feel me.
>
>                       * * *
>
> JAARA:    I do what I have to do nigga.  I
>           don't care if I have to kill for my
>           money nigga.  A bullet, a bullet in
>           the gun my nigga will solve my
>           problems nigga.
>
> DANH:     Yeah man.
>
> JAARA:    Shit nigga, but, if I had to, like
>           if I had to make that body for body
>           nigga, if I had I will nigga.  But
>           I ain't gonna do it just like that.

15.  Telephone records reveal that in or about and between March 2008 and the present the subscriber of telephone number (508) 797-5176 has been "Mohammad Jaara."  In or about March 2008, the defendant AHMED JAARA, also known as "Ahmed

Knight," advised the Worcester police department that his telephone number was (508) 797-5176 and that his father is Mohammad Jaara.

16. On or about November 22, 2010, law enforcement agents showed John Doe #1 a stack of photographs, which stack included a photograph of the defendant AHMED JAARA, also known as "Ahmed Knight." John Doe #1 identified the photograph of the defendant as the individual who provided him with the cellular telephone on or about August 16, 2010 – as described in Paragraph 4(a).

17. Because public filing of this document could result in a risk of flight by the defendant, as well as jeopardize the government's investigation, your deponent respectfully requests that the complaint and arrest warrant be filed under seal.

11

WHEREFORE, your deponent respectfully requests that an arrest warrant be issued so that the defendant AHMED JAARA, also known as "Ahmed Knight," may be dealt with according to law.

Philip Wu
Special Agent, FBI

Sworn to before me this
24th day of November, 2010

THE HONORABI
United State       S/ Mann
Eastern Dist